## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

LLOYD A. BARNES                                          CIVIL ACTION

VERSUS                                                        NO. 17-1415

DARRYL VANNOY, WARDEN                          SECTION: "N"(1)


## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Lloyd A. Barnes, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. On December 1, 2010, he was convicted of one count of attempted second degree murder and one count of second degree murder.[1] On February 4, 2011, he was sentenced on the attempted second degree murder conviction to a term of thirty years imprisonment and on the second degree murder conviction to a concurrent term of life

---

[1] State Rec., Vol. 6 of 8, trial transcript, p. 787; State Rec., Vol. 1 of 8, minute entry dated December 1, 2010; State Rec., Vol. 1 of 8, jury verdict forms.

imprisonment.[2]  On September 19, 2012, the Louisiana Fourth Circuit Court of Appeal affirmed his convictions and sentences.[3]  The Louisiana Supreme Court then denied his related writ application on April 1, 2013.[4]

On or about December 10, 2013, petitioner filed an application for post-conviction relief with state district court.[5]  That application was denied on February 14, 2014.[6]  His related writ applications were then likewise denied by the Louisiana Fourth Circuit Court of Appeal on April 15, 2014,[7] and by the Louisiana Supreme Court on October 28, 2016.[8]

On March 7, 2017, petitioner filed the instant federal application seeking habeas corpus relief.[9]  The state does not challenge the timeliness of the application.[10]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

---

[2] State Rec., Vol. 6 of 8, transcript of February 4, 2011; State Rec., Vol. 1 of 8, minute entry dated February 4, 2011.
[3] State v. Barnes, 100 So. 3d 926 (La. App. 4th Cir. 2012); State Rec., Vol. 7 of 8.
[4] State v. Barnes, 110 So. 3d 575 (La. 2013); State Rec., Vol. 7 of 8.
[5] State Rec., Vol. 8 of 8.
[6] State Rec., Vol. 8 of 8, Judgment dated February 14, 2014.
[7] State v. Barnes, No. 2014-K-0358 (La. App. 4th Cir. Apr. 15, 2014); State Rec., Vol. 8 of 8.
[8] State ex rel. Barnes v. State, 203 So. 3d 222 (La. 2016); State Rec., Vol. 8 of 8.
[9] Rec. Doc. 3.
[10] Rec. Doc. 14, p. 10.

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief. Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.

If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. White v. Woodall, 134 S. Ct. 1697, 1701 (2014).

## II. Facts

In the instant case, petitioner was indicted for the second degree murder of Korey "Project" Griffin and the attempted second degree murders of Griffin's friends, Clayton Burds and Robert Dilbert. At trial, the jury found petitioner guilty of the second degree murder of Griffin and the attempted second degree murder of Burds; however, it found him not guilty of the attempted second degree murder of Dilbert. On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the evidence adduced at trial as follows:

Officer Micheleen Scott of the New Orleans Police Department (NOPD) testified that on October 18, 2009, she investigated an auto collision at Washington Avenue and LaSalle Street.  The occupants of one of the vehicles, Griffin and Burds, had both sustained gunshot wounds but were able to communicate with her at the scene.  Burds gave Officer Scott a narrative of the shooting and the vehicle accident, describing the shooter as a male approximately six feet tall wearing grey sweatpants.  Officer Scott wrote the initial report of the collision, noting that no weapons were found in or near the vehicle.

Officer Shandrell Privott of the NOPD crime lab processed the collision scene and photographed a maroon car and Griffin's silver Chevy Malibu.  The officer recalled that the back passenger window of the Malibu was shattered and that the car's airbags had deployed.  While the front seat of the Malibu contained blood spots, the only other evidence – a spent bullet – was found in the back seat.

Detective Tim Sison of the NOPD assumed the investigation of the auto collision from Officer Micheleen Scott.  Detective Sison learned that the collision was related to a shooting in the 2000 block of Second Street and, at the time of the collision, the Malibu was traveling north on Washington Avenue, against traffic, when it collided with a parked car.  The occupants of the Malibu had been removed and placed in separate EMS units for transport to University Hospital.  Sison's cursory inspection of the vehicle indicated that no weapons were found in or near the vehicle.  Detective Sison relocated to University Hospital and obtained a description of the shooter from Burds but was able to speak with the Griffin very briefly.  In addition to explaining the events leading to the shooting, Griffin and Burds gave a description of their assailant.  Detective Sison collected, labeled and placed the blood stained clothing worn by Griffin and Burds into Central Evidence.  Upon returning to the hospital the next day, Detective Sison learned that Burds had been released but that Griffin had died during surgery.  Upon the Griffin's death, Detective Sison transferred the investigation to the NOPD homicide division.

Under cross examination, Detective Sison related that Burds described the shooter as being about six feet tall and wearing gray sweat pants.

Homicide Detective Robert Long of the NOPD assumed the investigation from Detective Sison, who provided him the names and contact information for the decedent's family.  The day after the shooting, Long met with the decedent's mother, Ms. Patricia Griffin, who gave him a gist of the shooting incident.  She also provided contact phone numbers for Burds and Dilbert.  Detective Long also retrieved a deformed projectile from the hospital.  According to Detective Long, Burds and Dilbert had described the shooter in statements to Detective Sison as a bald, older male with missing teeth and a stocky build who was wearing a white tee shirt and gray sweat pants.  Pursuant to his conversation with Burds and Dilbert, Detective Long relocated to the house where the shooting had purportedly occurred and spoke to "Carolyn," who was said to be associated with the defendant.

Subsequently, on October 20, 2009, Detective Long executed a search warrant at 2023 Second Street, the residence of Ms. Carolyn Lofton and the defendant.  He transported Ms. Lofton and the defendant to the homicide office to

interview them. Based upon Ms. Lofton's revelation that she was an eyewitness to the shooting, Detective Long obtained a warrant for the defendant's arrest. Detective Long identified the photo lineups from which Burds and Dilbert identified the defendant as the man who shot and killed the victim.

Officer Kathy Robertson, the 911 communications supervisor of the New Orleans Police Department (NOPD), testified that all 911 calls are recorded, documented by date, time and location of the incident, and assigned an incident item number that is referenced to the investigation of the incident reported. Officer Robertson listened to a portion of a tape recording and identified it as the 911 call reporting the shooting in this case.

Pathologist Dr. Richard Tracy performed the autopsy on the decedent's body. Dr. Tracy explained that the decedent sustained three gunshots to the back of his body. The bullet that caused his death entered his back, traveled to his abdomen and passed through major blood vessels, causing him to bleed to death. Dr. Tracy opined that even though the wound was fatal, the decedent could have remained conscious for about a minute before passing out. According to Dr. Tracy, two of the gunshot wounds were consistent with the victim being shot while he was on the ground.

Dilbert related that on the day that Griffin was killed, Griffin and Burds met him at his house at about 7:00 a.m. Griffin was driving a Chevy Malibu, and Burds and Dilbert rode as passengers in the front and rear seats, respectively. The three drove around the central city area smoking marijuana and then decided to stop at a residence in the 2000 block of Second Street. Burds and Dilbert remained in the car while Griffin went inside for about five minutes. According to Dilbert, Griffin was irate when he returned to the car, demanding an apology from someone in the residence. Dilbert and Burds decided to return to the residence with Griffin. They approached the house by walking in the street. None of them entered the front yard of the residence, nor did they go onto the steps or the porch of the residence. Dilbert stated that they were unarmed and had no weapons in the Malibu. A few moments after they arrived at the residence, the defendant and Carolyn Lofton exited the front door arguing. When Ms. Lofton saw Griffin, she explained to the defendant that he was a "regular." Still irate, Griffin demanded an apology from the defendant, who refused to apologize and began shooting at them. Dilbert turned and ran down Danneel Street to Washington Avenue.

Dilbert related the specifics of the shooting to Detective Long and identified the defendant from a photo lineup as the shooter.

Under cross-examination, Dilbert denied that he, Griffin and Burds got together that day to buy or sell drugs. He also said that the first shot the defendant fired hit Burds.

Burds testified that he and Griffin arrived in the city around 6:00 p.m. on the day before the shooting and sold drugs all night at Ms. Lofton's Second Street residence. The next morning, Burds, Griffin, and Dilbert met in the mid-city area. Burds stated that they were not armed that day. They rode around the uptown area, purchased marijuana and then returned to Ms. Lofton's residence on Second Street.

Griffin entered the residence while he and Dilbert remained in the car. A few moments later, Griffin returned to the car and said: "Nigger up in there tripping." Just then, the defendant and Carolyn Lofton exited the house and stood on the porch. Ms. Lofton asked Griffin what was going on and he responded that he wanted an apology from the defendant. The defendant refused to apologize and said: "I ain't apologizing for shit. That shit dead." Neither Burds, Dilbert nor Griffin entered the yard or went to the door of the residence. Immediately after Ms. Lofton explained to the defendant that she knew Griffin, the defendant shot Burds in the leg. Burds and Griffin ran toward Saratoga Street while Dilbert ran in the opposite direction. The defendant chased Burds and Griffin on foot. Burds made it into the parked Malibu but the defendant fired at the Malibu shattering the back window and hitting Burds in the back. Then the defendant chased and shot Griffin. As Griffin lay on the ground, the defendant stood over him and continued to shoot. Burds tried to run over the defendant with the Malibu, but the defendant ran into the Second Street residence. Griffin got into the Malibu's driver's seat and drove while Burds called 911. Burds passed out as he contacted the 911 operator but awoke when he heard the operator's voice. Griffin was able to drive the Malibu for a few blocks before he passed out and collided with a parked vehicle. Burds spoke to detectives at the hospital and he identified the defendant from a photo lineup as the shooter. Burds stated that Griffin was not a violent person and never carried a gun.

In 1999, Sergeant Jimmie Turner investigated a shooting in the 3200 block of General Ogden Street. Sergeant Turner spoke to the victim, Cornelius Wells, who identified the defendant as his assailant. Wells identified the defendant from a photo lineup. Cornelius Wells testified that the defendant shot him in the arm, back, leg and stomach on May 13, 1999, on General Ogden Street. He explained that a man gave him money to buy drugs for him, but Wells failed to return with the drugs. The man later tracked him down, and the defendant shot him.

The State and defense stipulated that if Officer Kenneth Leary were called to testify, he would be qualified as an expert in the area of ballistics and firearms examination and identification. He would testify that the bullet recovered from the vehicle collision scene and the bullet recovered during the victim's autopsy were consistent with .45 caliber class ammunition and were fired from the same weapon.

Detective Long was called by the defense and stated that neither the victim, Burds or Dilbert told him they were drug dealers.

Ms. Carolyn Lofton testified for the defense that, through his friendship with her son, she had known "Project" for years. On the morning of the shooting, she was sleeping in her residence on Second Street[FN 1] when Griffin arrived. She awoke to an argument between the defendant and Griffin over Griffin entering her house while she slept. Ms. Lofton quelled the confrontation and told Griffin to leave. As Griffin was leaving, he warned the defendant that he better not go outside that day. Ms. Lofton locked the door behind Griffin but then had to open it to allow the defendant to leave. When she reopened the door, Griffin and two of his friends were approaching her residence. Griffin pointed the defendant out to his friends

and said: "That's him ... [h]e's going to apologize to me." Ms. Lofton stood on the porch and the defendant stood behind her. She feared that Griffin and his friends had come to "jump" the defendant. Although she warned them not to come into her yard, one of Griffin's friends jumped on the porch and swung at the defendant. As the other friend entered the gate, Ms. Lofton heard a gunshot but did not know where it came from. Burds fell off the porch and they all ran away. According to Ms. Lofton, she went back to sleep. Under cross-examination, Ms. Lofton admitted that she told the police that the gunshot came from behind her.

> [FN 1]  In closing argument, the prosecutor referenced Ms. Lofton's residence as "a crack house ... a straight up crack house."  (Tr. trans. p. 764).

The defendant testified that his name was Lloyd Bornes, though his name is sometimes incorrectly spelled "Barnes."  He admitted to having criminal convictions – 1985 simple robbery; 2006 and 2007 assaults; 2008 evading arrest and criminal trespassing. At the time of the shooting, the defendant was living with Ms. Lofton at 2023 Second Street. He testified that there was no buying or selling of drugs at the residence. The defendant's usual daily routine was to have coffee with his friend, Mr. Duey, in the morning and then go to his mother's house. Typically, at the end of the day, he returned to the Second Street residence.

The defendant recalled that about 7:30 a.m. on the day of the shooting, he was preparing to have his morning coffee with Mr. Duey when Griffin knocked at the door asking for "moms", the name given Ms. Lofton by her children and their friends. The defendant advised Griffin that Ms. Lofton was asleep and suggested that he come back later but Griffin demanded that he wake her up. The defendant refused and a verbal confrontation erupted. The defendant walked to the back of the house and called to Ms. Lofton. As the defendant turned around, he discovered that Griffin had followed him to Ms. Lofton's bedroom. The defendant admonished Griffin for his disrespectful behavior, to which Griffin responded: "F--- you." Just then, Ms. Lofton appeared asking what the loud talking was about. The defendant explained the situation to her. Ms. Lofton told Griffin to leave and, as he did so, he said to the defendant: "Just for that, you can't come outside today." Griffin told Ms. Lofton: "That nigger gonna apologize. He don't know me." Ms. Lofton closed the door. Moments later, she noticed Griffin and two of his friends coming to the house. Griffin climbed the front steps and Burds jumped onto the porch. Dilbert remained at the front gate. Griffin stood directly in front of Ms. Lofton and swung at the defendant. The defendant shot Burds out of fear for his and Ms. Lofton's safety. Then the defendant shot Griffin as he ran away and continued to shoot until his gun was empty. Griffin and Burds drove away in a Malibu. The defendant placed his gun in the utility shed in the back of the house. The defendant claimed that he did not know that he had shot anyone.

The defendant said that Griffin was not armed when they confronted one another on the porch. He did not know whether Burds was armed, but he did not see a weapon. The defendant said that he did not know what Griffin and his friends

were going to do when they returned, but he felt that they were going to "kick his ass." After the shooting, the defendant went to his mother's house to watch the Saints' game.

Under cross-examination, the defendant affirmed that he shot the victim and Burds in the back. Further, he fired all the bullets in his gun as the three men were running. He did not see a weapon in either the victim's or Burds' hands as they approached the porch. During a phone call while he was incarcerated, the defendant told his mother to remind Ms. Lofton that everything happened on the porch. The State played the recording of the call in which the defendant told his mother to tell Ms. Lofton that Mr. Duey was going to tell the police everything happened on the porch.[11]

### III.   Petitioner's Claims

### A.  Sufficiency of the Evidence

Petitioner claims that there was insufficient evidence to support his convictions.[12]   On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

[T]he defendant complains that the State failed to prove his guilt beyond a reasonable doubt. Specifically, he argues that the State failed to prove that he did not act in self-defense when he shot and killed the victim and shot Burds.

The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La. 1988). Additionally, the court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Id. The trier of fact determination of credibility is not to be disturbed on appeal absent an abuse of discretion. State v. Cashen, 544 So.2d 1268 (La.App. 4 Cir. 1989).

The defendant herein was found guilty of second-degree murder and attempted second-degree murder. Second-degree murder is defined as the killing of a human being with the specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1; State v. Guy, 95-0899 (La.App. 4 Cir. 1/31/96), 669 So.2d 517.

La. R.S. 14:27, which defines "attempt," reads in pertinent part:

---

[11] State v. Barnes, 100 So. 3d 926, 929-33 (La. App. 4th Cir. 2012); State Rec., Vol. 7 of 8.

[12] Petitioner lists this as the second claim in his federal application. However, for ease of analysis, it is considered first in this opinion.

> A.  Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

Thus, to convict the defendant of attempted second-degree murder, the State had to prove beyond a reasonable doubt that he specifically intended to kill Burds and that he committed an "act for the purpose of and tending directly toward the accomplishing of" that intent.  La.Rev.Stat. 14:27(A); 14:30.1(A)(1).  "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."  La.Rev.Stat. 14:10(1).  It may be "inferred from the defendant's actions and the circumstances of the transaction."  State v. Brown, 2003-897, p. 22 (La. 4/12/05), 907 So.2d 1, 18.

When a defendant claims that he acted in self-defense, the State must prove beyond a reasonable doubt that the homicide was not justifiable under La.Rev.Stat. 14:20.  State v. Causey, 96-2723 (La.App. 4 Cir. 10/21/98), 721 So.2d 78.  A homicide is justifiable if committed by one in defense of himself when he reasonably believes that he is in imminent danger of being killed or of receiving great bodily harm and that the homicide is necessary to save himself from that danger.  La.Rev.Stat. 14:20(A)(1).  Although there is no unqualified duty to retreat, the possibility of escape is a factor in determining whether or not the defendant had a reasonable belief that deadly force was necessary to avoid the danger.  State v. McClain, 95-2546 (La.App. 4 Cir. 12/11/96), 685 So.2d 590.  However, a defendant who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that the defendant desires to withdraw and discontinue the conflict.  Id.

In a non-homicide case where self-defense is raised, the reviewing court must conduct a dual inquiry:  it must objectively determine whether the force used was reasonable under the circumstances; and it must also subjectively decide whether the force was apparently necessary.  State v. Freeman, 427 So.2d 1161 (La. 1983).

After reviewing the evidence in the light most favorable to the prosecution, the State proved that the defendant did not act in self-defense.  Dr. Tracy testified that the victim sustained three gunshots to the back of his body.  The bullet that caused the victim's death entered his back, traveled to his abdomen and passed through major blood vessels, causing the victim to bleed to death.  Dr. Tracy further testified that two of the gunshots wounds were consistent with the victim being shot while he was lying on the ground.  In addition, Burds testified that the defendant shot him in the back and then chased the unarmed victim continuing to shoot at the victim until the gun ran out of ammunition.  Moreover, the defendant's own

testimony negated his claim of self-defense.   Under questioning during cross-examination, the prosecutor asked:

> Q.      And at that point, what's the next thing that happens? Clayton –
>
> A.      Clayton's on the porch.  He comes toward me with a swing. I shoots [sic].  The [victim] turns around and runs down the steps.  I shoots [sic], and I kept shooting ...
>
> Q.      ... you shoot Clayton on the porch.  Then you shoot, as you described, the big man (the victim), as he's running from the porch?
>
> A.      Running down the porch, yes.
>
> Q.      So as he's running away from you, you shot him?
>
> A.      Yes.
>
> Q.      As he's running away from you?
>
> A.      Running down the steps.

Thus, according to his own testimony, the defendant was not trying to avoid the victim when he shot him; instead, the defendant armed himself to confront Griffin, Burds and Dilbert, all of whom were unarmed.  As the defendant claimed, Griffin was younger and larger than him, but the defendant could have avoided the shooting by merely stepping back into his residence and closing the door.  The only evidence of provocation came from the defendant's testimony.  The jury's rejection of the defendant's provocation testimony is an issue of credibility and not an abuse of discretion.   See State v. Byes, 97-1876 (La.App. 4 Cir. 4/21/99), 735 So.2d 758. As such, the evidence does not show that the defendant was justified in using deadly force to avoid harm to himself or Ms. Lofton.  Accordingly, the State presented sufficient evidence to counter the defendant's self-defense claim beyond a reasonable doubt and the jury did not err by convicting him of second-degree murder and attempted second-degree murder.  This assignment is without merit.[13]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning

additional reasons.[14]

---

[13] State v. Barnes, 100 So. 3d 926, 933-35 (La. App. 4th Cir. 2012); State Rec., Vol. 7 of 8.
[14] State v. Barnes, 110 So. 3d 575 (La. 2013); State Rec., Vol. 7 of 8.

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000).  For the following reasons, the Court finds that he has made no such showing.

As the Louisiana Fourth Circuit Court of Appeal correctly noted, claims challenging the sufficiency of the evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979).  In Jackson, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'"  Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added); see also Cavazos v. Smith, 565 U.S. 1, 2 (2011) ("[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. ...  Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.").

Moreover, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the

AEDPA, the standard to be applied by this Court is in fact "twice-deferential." Parker v. Matthews, 567 U.S. 37, 43 (2012); see also Coleman v. Johnson, 566 U.S. 650, 651 (2012). Applying that stringent standard, the Court finds that petitioner is not entitled to relief for the following reasons.

In the instant case, petitioner conceded that he shot the victims; he merely claimed that he was not guilty because he had acted in self-defense. Under Louisiana law, "when a defendant claims self-defense, the state has the burden of establishing beyond a reasonable doubt that he did not act in self-defense." State v. Garcia, 483 So. 2d 953, 956 (La. 1986). Here, the state met that burden.

Even if Griffin was initially the aggressor in this altercation, petitioner admits that he shot both Griffin and Burds, who were *unarmed*, in the *back* as they were *retreating* from the altercation. Under such circumstances, petitioner's claim of self-defense simply had no merit under Louisiana law. See, e.g., State v. Taylor, 721 So. 2d 929, 932 (La. App. 1st Cir. 1998) ("Even if the victim herein was initially the aggressor, it was unreasonable for defendant to respond with deadly force. This is especially true after the unarmed victim attempted to withdraw from the conflict. It is particularly pertinent in this regard that the victim was unarmed and was stabbed in the back as he was attempting to flee."); State v. Dugas, 683 So. 2d 1253, 1257 (La. App. 3rd Cir. 1996) ("[S]hots in the back are inconsistent with self-defense; and shots while an unarmed victim moves away are inconsistent with self-defense.").

In summary, when the evidence in this case is viewed in the light most favorable to the prosecution, it simply cannot be said that the guilty verdicts were irrational. Therefore, petitioner cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court

14

of the United States.  Accordingly, under the doubly deferential standards of review which must

be applied by this federal habeas court, relief is not warranted.[15]

## B.  Ineffective Assistance of Counsel

Petitioner also claims that he received ineffective assistance of counsel at trial.  In the state

post-conviction proceedings, the district court denied that claim, holding:

> Petitioner argues that he was denied effective assistance of counsel as guaranteed
> by the Sixth Amendment to the United States Constitution.  Petitioner contends that
> trial counsel failed to effectively cross examine the state's witnesses.  Specifically,
> Petitioner contends that trial counsel failed to use the police report to impeach the
> witnesses' testimony and present evidence of their prior inconsistent statements.  In
> Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court
> held that the "benchmark for judging any claim of ineffectiveness must be whether
> counsel's conduct so undermined the proper functioning of the adversarial process
> that the trial cannot be relied on as having produced a just result".  Id. at 699.  In
> particular, the defendant must show that his representation fell below an objective
> standard of reasonableness *and* that but for counsel's errors, the result(s) of the trial
> would have been different.  Id.  Further, it is unnecessary to address the issues of
> both counsel's performance and prejudice to the defendant if the defendant makes
> as inadequate showing on one of the components.  State v. Serigny, 610 So.2d 857,
> 859-60 (La.App. 1st Cir. 1992), writ denied, 614 So.2d 1263 (La. 1993).  Here,
> counsel's action falls well within the ambit of trial strategy, which does not
> establish ineffective assistance of counsel.  Further, the record shows that the jury
> was presented with evidence of the witnesses' inconsistent statements.  Thus,
> Petitioner fails to show that counsel's representation fell below an objective
> standard of reasonableness and but for counsel's errors, the end result would have
> been different.  Accordingly, Petitioner's claim is without merit.[16]

---

[15] Out of an abundance of caution, the Court notes that in arguing that the state failed to meet its burden of proof, petitioner also states in passing that "[t]he trial court incorrectly charged the jury on the aggressor doctrine, retreat and intruders."  Rec. Doc. 3-1, p. 15.  It does not appear that petitioner intended for that statement to be construed as a separate claim.  Nevertheless, even if that was his intention, he has not established that relief would be warranted.  His statement that the jury instructions were erroneous is wholly conclusory, in that he does not explain in what specific respect he believes the instructions were incorrect.

[16] State Rec., Vol. 8 of 8, Judgment dated February 14, 2014.

The Louisiana Fourth Circuit Court of Appeal then found "no error" in that ruling,[17] and the Louisiana Supreme Court likewise denied relief stating that petitioner failed to show that he received ineffective assistance of counsel under the <u>Strickland</u> standard.[18]

Because an ineffective assistance of counsel claim presents a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claim on the merits unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); <u>Moore v. Cockrell</u>, 313 F.3d 880, 881 (5th Cir. 2002). Further, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the <u>Strickland</u> standard was unreasonable. This is different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Ibid</u>. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

---

[17] <u>State v. Barnes</u>, No. 2014-K-0358 (La. App. 4th Cir. Apr. 15, 2014); State Rec., Vol. 8 of 8.
[18] <u>State *ex rel.* Barnes v. State</u>, 203 So. 3d 222 (La. 2016); State Rec., Vol. 8 of 8.

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted).  The Supreme Court then explained:

> Surmounting Strickland's high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult.  *The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.*  The Strickland standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

Id. at 105 (citations omitted; emphasis added).  Therefore, on a habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt."  Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (quotation marks omitted; emphasis added).  For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claim.

As the state courts correctly noted, the United States Supreme Court has established a two-prong test for evaluating ineffective assistance of counsel claims.  Specifically, a petitioner seeking relief on such a claim is required to show both that counsel's performance was deficient *and* that

the deficient performance prejudiced his defense.  Strickland, 466 U.S. at 697.  The petitioner bears

the burden of proof and "must demonstrate, by a preponderance of the evidence, that his counsel

was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson,

227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that the petitioner has made an insufficient

showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it

may dispose of the ineffective assistance claim without addressing the other prong.  Strickland,

466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that

counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.

See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if

it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th

Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of

counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is

necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as

of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting

Strickland, 466 U.S. at 690).  The petitioner must overcome a strong presumption that the conduct

of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter,

796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there

is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different."  Strickland, 466 U.S. at 694.  In this context, a reasonable probability

is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a

determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."   Crockett, 796 F.2d at 793.

Here, petitioner argues that counsel failed to effectively cross-examine Dilbert and Burds with respect to their testimony that neither they nor Griffin entered onto the yard or porch prior to the shooting.[19]  Petitioner argues that counsel should have cross-examined them on that point based on a police report indicating that they had stated otherwise during police interviews.

However, it is clear that "[t]he decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment."  Ford v. Cockrell, 315 F. Supp. 2d 831, 859 (W.D. Tex. 2004), aff'd, 135 Fed. App'x 769 (5th Cir. 2005); accord Lewis v. Cain, Civ. Action No. 09-2848, 2009 WL 3367055, at *8 (E.D. La. Oct. 16, 2009), aff'd, 444 Fed. App'x 835 (5th Cir. 2011); Williams v. Cain, Civ. Action Nos. 06-0224 and 06-0344, 2009 WL 1269282, at *11 (E.D. La. May 7, 2009), aff'd, 359 Fed. App'x 462 (5th Cir. 2009); Packnett v. Cain, Civ. Action No. 06-5973, 2008 WL 148486, at *11 (E.D. La. Jan. 10, 2008); Parker v. Cain, 445 F. Supp. 2d 685, 710 (E.D. La. 2006).  Moreover, the United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such tactical matters through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy.  Strickland, 466 U.S. at 689. Additionally, it is irrelevant that another attorney might have made other choices or handled such issues differently.  As the Supreme Court noted:  "There are countless ways to provide effective

---

[19] See, e.g., State Rec., Vol. 5 of 8, trial transcript, pp. 456-59 (Dilbert) and 497 (Burds).

assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way." Id.

Here, petitioner has failed to show that counsel's cross-examination was deficient in the challenged respect.  For example, the record reflects that defense counsel did in fact vigorously cross-examine both Dilbert and Burds concerning where they were standing at the time of the incident *and* what statements they had made to police on that issue.[20]  In addition, Dilbert's recorded police statement was even played for the jury in an attempt to impeach him.[21]

Further, in any event, petitioner also cannot show that he was prejudiced by that cross-examination.  As noted, to establish prejudice under Strickland, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  In the instant case, it would have made no difference even if counsel had been able to extract an admission from Dilbert and/or Burds that they or Griffin were actually on the porch or in the yard. *Regardless of where the three were located*, petitioner himself testified at trial that he did not see any of the three armed with a weapon and that he shot Burds and Griffin in the *back* as they were *running away* from the altercation.[22] In light of that testimony, petitioner's sole defense, i.e. self-defense, had no merit.  Therefore, there is no reasonable probability that a more effective cross-examination of Dilbert and/or Burds would have resulted in a different outcome at trial.

---

[20] See, e.g., State Rec., Vol. 5 of 8, trial transcript, pp. 464-65 (Dilbert), 470 (Dilbert), 481-82 (Dilbert), 508 (Burds), and 510-15 (Burds).

[21] Id. at pp. 480-83.  Burds' statement to the police was also played for the jury "for record purposes"; however, the trial court did not allow its actual introduction.  Id. at pp. 524-26.

[22] See, e.g., State Rec., Vol. 6 of 8, trial transcript, pp. 662 and 684-687.

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He has not made that showing in the instant case. Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

## C.  Incomplete Trial Transcript

Petitioner's third claim is that he was denied his right to appeal as a result of an incomplete trial transcript. In the state post-conviction proceedings, the district court denied that claim, holding:

> [Petitioner] contends that his right to appeal was violated because his trial transcript was incomplete or missing. A criminal defendant has a right to a complete transcript of trial proceedings, particularly where counsel on appeal was not counsel at trial. State v. Landry, 97-0499, p. 3 (La. 6/29/99), 751 So.2d 214, 215. Without a complete record from which a transcript for appeal may be prepared, a defendant's right of appellate review is rendered meaningless. A slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal does not result in reversal of the conviction. State v. Ford, 338 So.2d 107, 110 (La. 1976). Here, the record shows that Petitioner's trial transcript was true and complete. Thus, Petitioner's contention is incorrect. Accordingly, Petitioner's claim is without merit.[23]

The Louisiana Fourth Circuit Court of Appeal then found "no error" in that ruling,[24] and the Louisiana Supreme Court likewise denied relief stating that petitioner failed "to satisfy his post-conviction burden of proof and/or state cognizable grounds for relief on collateral review."[25]

---

[23] State Rec., Vol. 8 of 8, Judgment dated February 14, 2014.

[24] State v. Barnes, No. 2014-K-0358 (La. App. 4th Cir. Apr. 15, 2014); State Rec., Vol. 8 of 8.

[25] State ex rel. Barnes v. State, 203 So. 3d 222 (La. 2016); State Rec., Vol. 8 of 8.

As an initial matter, this Court notes that the federal constitution is not necessarily violated simply because a complete verbatim transcript of a criminal proceeding is unavailable.  See, e.g., Higginbotham v. Louisiana, 817 F.3d 217, 222 (5th Cir.), cert. denied, 137 S. Ct. 506 (2016); Moore v. Wainwright, 633 F.2d 406, 408 (5th Cir. 1980); Lipton v. Cain, Civ. Action No. 96-2987, 2007 WL 2316725, at *8 (E.D. La. Aug. 8, 2007).  Rather, a violation occurs only if the record is inadequate for the purposes of the appeal.  Higginbotham, 817 F.3d at 222; Mullen v. Blackburn, 808 F.2d 1143, 1146 (5th Cir. 1987); Schwander v. Blackburn, 750 F.2d 494, 497-98 (5th Cir. 1985).  Therefore, in order to prevail on a claim that the record was inadequate, a petitioner must prove that the missing portion of the transcript actually prejudiced his appeal in some manner.  See Higginbotham, 817 F.3d at 222; Mullen, 808 F.2d at 1146; Hedgespeth v. Warden, Louisiana State Penitentiary, Civ. Action No. 11-cv-2078, 2015 WL 1089325, at *6 (W.D. La. Mar. 5, 2015); McDonald v. Thaler, Civ. Action No. H-09-2767, 2010 WL 2640135, at *18 (S.D. Tex. June 30, 2010); Bozeman v. Cain, Civ. Action No. 09-8423, 2010 WL 2977393, at *4 (E.D. La. June 7, 2010), adopted, 2010 WL 2977402 (E.D. La. July 20, 2010).

Petitioner has made no such showing in this case.  At most, he has established only that page 610 of the transcript is mostly blank.[26]  However, that page was followed by an unnumbered page of the transcript which was from the same portion of the trial, and then page 611 followed the unnumbered page with no break in continuity.  Even if the Court assumes that some portion of the transcript was missing based on that discrepancy, petitioner has not shown that this missing portion adversely affected him.  Rank speculation that some untranscribed portion of the proceeding *might* have revealed additional errors which could have been asserted on appeal is

---

[26] That portion of the transcript appears in Volume 6 of the state court record.

obviously insufficient to warrant relief.  See, e.g., Thomas v. Cain, Civ. Action No. 12-2818, 2013 WL 5960808, at *5 (E.D. La. Nov. 6, 2013); Williams v. Cain, Civ. Action No. 05-0710, 2008 WL 3363562, at *26 (E.D. La. Aug. 8, 2006) ("To warrant federal habeas corpus relief on a claim that state court transcripts are unconstitutionally incomplete, the petitioner must support his claims with more than mere unsubstantiated, transparent speculation.").

For these reasons, this claim should be denied.

### D.  Knowing Use of Perjured Testimony

Petitioner's fourth claim is that his rights were violated when the prosecution knowingly used perjured testimony to secure the conviction.  In the state post-conviction proceedings, the district court denied that claim, holding:

> Petitioner contends that he was denied his constitutional right to a fair and an impartial trial when the State utilized perjured testimony.  However, Petitioner fails to show that the witness's testimony was false and that the State acted in collusion with the witness to facilitate such testimony.  State v. Broadway, 96-2659, p. 17 (La. 10/19/99), 753 So.2d 801, 814.  Further, there is no reasonable likelihood that the testimony given by the State's witness would have affected the outcome of the trial.  Accordingly, Petitioner's claim is without merit.[27]

The Louisiana Fourth Circuit Court of Appeal then found "no error" in that ruling,[28] and the Louisiana Supreme Court likewise denied relief stating that petitioner failed "to satisfy his post-conviction burden of proof and/or state cognizable grounds for relief on collateral review."[29]

A claim of prosecutorial misconduct, including the use of false testimony, presents a mixed question of law and fact.  Harvey v. Cain, Civ. Action No. 13-2994, 2013 WL 6490484, at *5 (E.D. La. Dec. 10, 2013).  Therefore, to obtain federal relief, petitioner must show that the state

---

[27] State Rec., Vol. 8 of 8, Judgment dated February 14, 2014.
[28] State v. Barnes, No. 2014-K-0358 (La. App. 4th Cir. Apr. 15, 2014); State Rec., Vol. 8 of 8.
[29] State ex rel. Barnes v. State, 203 So. 3d 222 (La. 2016); State Rec., Vol. 8 of 8.

court's decision denying this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  For the following reasons, it is clear that he has not made that showing.

It is true that due process may be violated if a prosecutor knowingly uses false testimony at trial or allows untrue testimony to go uncorrected.  Giglio v. United States, 405 U.S. 150, 153 (1972); Napue v. Illinois, 360 U.S. 264, 269 (1959); Faulder v. Johnson, 81 F.3d 515, 519 (5th Cir. 1996).  However, a petitioner is entitled to relief on such a claim only if he shows that (1) the testimony in question was actually false, (2) the prosecutor knew it was false, and (3) the testimony was material.  Duncan v. Cockrell, 70 Fed. App'x 741, 744 (5th Cir. 2003).

Here, Dilbert testified at trial that that he, Griffin, and Burds did not enter the yard or go onto the porch during the incident.  Petitioner contends that testimony was false, and the prosecutor knew it was false, because Detective Long indicated that Dilbert had stated the contrary during the police investigation.

Based on the record, this Court cannot say that Dilbert's testimony was in fact false, much less that the prosecutor knew that it was false.  Both Dilbert and Long were questioned at length concerning what had been said concerning the relative positions of the persons involved in the shootings.  Dilbert emphatically testified that he, Burds, and Griffin were not on the property at the time of the shooting.[30]  Long did in fact initially testify that Dilbert indicated otherwise in his statement;[31] however, Long seemed to retreat from testimony on cross-examination, noting that he was "speculating" where Dilbert, Burds, and Griffin were positioned based on his interpretation

---

[30] State Rec., Vol. 5 of 8, trial transcript, pp. 464-65, 470, and 481-82.
[31] State Rec., Vol. 6 of 8, trial transcript, pp. 574-75.

of Dilbert's statement.[32]  However, *even if* the testimony of Dilbert and Long was contradictory

on that point, the mere fact that the testimony of two witnesses is contradictory is insufficient to

establish a claim that the prosecutor has knowingly and intentionally presented false testimony.

See, e.g., Koch v. Puckett, 907 F.2d 524, 531 (5th Cir. 1990).  Nevertheless, in any event, Dilbert's

recorded statement was actually *played at trial*,[33] and the trial judge found that Dilbert's testimony

was *not* in fact inconsistent with that statement.[34]

For all of these reasons, petitioner cannot show that the state court's decision denying this

claim "was contrary to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

Therefore, relief is not warranted.

### E.  "Other Crimes" Evidence

The Court notes that petitioner mentions, but does not appear to list as a separate claim,

that he believes the trial court erred in allowing evidence concerning his involvement in the

unrelated 1999 shooting.[35]  However, even if petitioner intended to assert a claim herein regarding

that evidentiary ruling, the Court finds that the claim has no merit for the following reasons.

On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

[T]he defendant argues the trial court erred when it permitted the introduction of inadmissible other crimes evidence relative to a 1999 shooting incident involving the defendant.  The defendant contends that this evidence was highly prejudicial and of no probative value.
   La.Code Evid. art. 404B(1), the controlling statutory authority on this issue provides:

---

[32] Id. at pp. 578-93.

[33] State Rec., Vol. 5 of 8, trial transcript, pp. 480-83.

[34] See, e.g., State Rec., Vol. 5 of 8, trial transcript, p. 569 ("The gentleman did not testify differently.  You played Mr. Dilbert's statement for him.  Nothing that he said in the statement was contrary to his testimony.  Nothing at all.").

[35] Rec. Doc. 3-1, p. 15.

B.  Other crimes, wrongs, or acts.  (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

Generally, a court may not admit evidence of other crimes to show a defendant is a man of bad character who has acted in conformity with his bad character.  State v. Brown, 2003-1616, p. 6 (La.App. 4 Cir. 3/31/04), 871 So.2d 1240, quoting State v. Taylor, 2001-1638, p. 10 (La. 1/14/03), 838 So.2d 729, 741.

However, the State may introduce evidence of other crimes, wrongs or acts if it establishes an independent and relevant reason for its admissibility, such as to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.  La.Code Evid. art. 404 B(1).  The State must provide the defendant with notice and a hearing before trial if it intends to offer such evidence.  State v. Prieur, 277 So.2d 126 (La. 1973).  Additionally, the State must prove that the defendant committed the other acts.  Id.

In State v. Arrington, 97-2059, pp. 7-8 (La.App. 4 Cir. 4/21/99), 738 So.2d 1087, 1091, this court discussed the use of evidence of other crimes:

Before evidence of other crimes is admitted as proof of intent, three prerequisites must be satisfied:  (1) the acts must be similar, (2) there must be a real genuine contested issue of intent at trial, and (3) the probative value of the evidence must outweigh its prejudicial effect.  State v. Romero, 574 So.2d 330, 336 (La. 1990); State v. Kahey, 436 So.2d 475, 488 (La. 1983).  In addition, there must first be clear and convincing evidence of the commission of the other crimes and the defendant's connection with them ...

A trial court's ruling on the admissibility of evidence pursuant to La.Code Evid. art. 404 B(1) will not be disturbed absent an abuse of discretion.  State v. Gibson, 99-2827, p. 12 (La.App. 4 Cir. 4/11/01), 785 So.2d 213, 220.

La. C.E. art. 1104 sets forth the burden of proof in such instances:

State v. Prieur; pretrial; burden of proof
        The burden of proof in a pretrial hearing held in accordance with State v. Prieur, 277 So.2d 126 (La. 1973), shall be identical to

the burden of proof required by Federal Rules of Evidence Article IV, Rule 404.

In Huddleston v. U.S., 485 U.S. 681, 682, 108 S.Ct. 1496, 1497, 99 L.Ed.2d 771 (1988), the U.S. Supreme Court, in reviewing the standard of proof for other crimes evidence under Federal Rule of Evidence 404(B), concluded that the trial court does not have to make a preliminary finding that the prosecution has proved the "other act" by a preponderance of the evidence before the trial court allows the evidence to be submitted to the jury. The Court held other crimes evidence should be admitted if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act.[FN 2]

> [FN 2]  See Justice Traylor's concurring opinion in State v. Connolly, 96-1680, p. 1, 2 (La. 4/28/98), 707 So.2d 1249:
>
> > I write only to correct what I believe to be a misstatement of the standard of proof required for admissibility of unadjudicated other crimes ... As I read and apply [La. C.E.] article 1104, the burden of proof required of the state in order to introduce evidence of other crimes has been reduced from "clear and convincing" to "sufficient evidence to support a finding by the jury that the defendant committed the act" ... The U.S. Supreme Court has addressed the burden of proof required for admissibility under Rule 404 and held that "such evidence should be admitted if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act." Huddleston v. United States, 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). This Court interpreted Huddleston in Brooks I and stated that the federal standard was "a mere preponderance of the evidence." State v. Brooks, 541 So.2d 801, 813 (La. 1989) (citing to Huddleston). However, such a standard was specifically rejected in Huddleston. Huddleston, 485 U.S. at 687, 108 S.Ct. at 1500. The Huddleston court concluded that proving the act by a preponderance of the evidence is not necessary, Id. at 689, 108 S.Ct. at 1501, and went on to explain that the trial court does not weigh credibility and does not make a determination that the government has proven the act by a preponderance of the evidence. Id. at 690, 108 S.Ct. at 1501-02. Instead, "[t]he court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact ... by a preponderance of the evidence." Id.
> >
> > Therefore, the burden of proof for admission of other crimes under Prieur and La.Code Evid. art. 404 as modified by [La. C.E.] art. 1104 is sufficient evidence to support a finding by the jury that the defendant committed the act.

In this case, under either the preponderance of evidence or clear and convincing standard,[FN 3] the State proved that the defendant committed the shooting in 1999 through the testimony of Sergeant Turner and Cornelius Wells. Specifically, Sergeant Turner testified that he investigated the shooting of Cornelius Wells in May 1999. Turner learned from Wells the identity of the shooter and how to locate him. On May 27, 1999, Turner compiled a photographic lineup from which Wells identified the defendant as the man who shot him in the back. Wells testified that the defendant shot him in his leg, arm, back and stomach on May 13, 1999, as Wells was running away from the defendant. Wells related that

the shooting stemmed from a drug deal – a man had given Wells money to buy drugs for him. After Wells failed to deliver the drugs and did not return the money, the defendant tracked Wells down and shot him. Wells identified the defendant from a police photo lineup and in court as the man who shot him.

> [FN 3] In State v. Arrington, 97-2059, pp. 7-8 (La.App. 4 Cir. 4/21/99), 738 So.2d 1087, 1091, this court declared that there must be clear and convincing evidence of the defendant's commission of the prior offense. However, the Louisiana Supreme Court has not made a determination concerning the burden of proof – clear and convincing versus preponderance of the evidence. In State v. Jacobs, 99-0991, pp. 24-25 (La. 5/15/01), 803 So.2d 933, 952, n. 15, the Louisiana Supreme Court stated: "The standard for determining a defendant's connexity with the other prior crimes, i.e., by a preponderance of the evidence or by clear and convincing evidence, for purposes of determining admissibility of other crimes evidence, remains an open question in this court. See La.Code Evid. art. 1104."

The State offered the evidence to show that the defendant was motivated to shoot people involved in the drug trade who disrespect him. Based on the foregoing, the trial judge did not abuse her discretion in admitting the evidence of other crimes. The State met its burden of proof in that regard. However, even assuming the trial court did err in admitting the other crimes evidence, the error is harmless. The erroneous admission of other crimes evidence is subject to harmless error analysis. State v. Maise, 2000-1158 (La. 1/15/02), 805 So.2d 1141. The test for determining harmless error is whether the reviewing court may conclude that the error was harmless beyond a reasonable doubt, State v. Casey, 99-0023 (La. 1/26/00), 775 So.2d 1022, or "whether the guilty verdict actually rendered in [the] trial was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). Other crimes evidence must tend to prove a material fact genuinely at issue, and the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. La.Code Evid. art. 403; State v. Hatcher, 372 So.2d 1024, 1033 (La. 1979).

The defendant herein pleaded self-defense; the State introduced the other crimes evidence as proof of his motivation to shoot drug dealers who crossed him. The defendant testified that he shot Griffin and Burds in the back as they attempted to escape. Further, he admitted that he shot at them until his ammunition ran out. The defendant's testimony disproved his claim of self-defense. The other crimes evidence was more probative than prejudicial. Thus, it can be concluded beyond a reasonable doubt that the jury rested its verdict on the evidence properly introduced rather than the 1999 shooting.

This assignment has no merit.[36]

---

[36] State v. Barnes, 100 So. 3d 926, 935-38 (La. App. 4th Cir. 2012); State Rec., Vol. 7 of 8.

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[37]

The United States Fifth Circuit Court of Appeals has held:  "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law."  Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998).  Therefore, to the extent that petitioner is arguing that the state courts misapplied state evidence law, his claim simply is not reviewable in this federal proceeding.

To the extent that petitioner is asserting a federal claim, he fares no better.  Even if petitioner could show that the evidence was in fact improperly admitted, federal habeas relief still would not be warranted.  The United States Fifth Circuit Court of Appeals has explained:

> We will not grant habeas relief for errors in a trial court's evidentiary rulings unless those errors result in a "denial of fundamental fairness" under the Due Process Clause.  The erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction.

Neal v. Cain, 141 F.3d 207, 214 (5th Cir. 1998) (citations omitted); accord Little, 162 F.3d at 862 ("[O]nly when the wrongfully admitted evidence has played a crucial, critical, and highly significant role in the trial will habeas relief be warranted.").

As already noted, petitioner admitted at trial that he shot the *unarmed* Griffin and Burds in their *backs* as they were *running away*.  The guilty verdicts in this case obviously resulted from those damning admissions and the corroborating testimony of the state's other witnesses – *not* from the evidence of the unrelated 1999 shooting.  It simply cannot be said that the evidence concerning that shooting played any role – much less a "crucial, highly significant" one – in these convictions.

---

[37] State v. Barnes, 110 So. 3d 575 (La. 2013); State Rec., Vol. 7 of 8.

For all of these reasons, this claim should be denied.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Lloyd A. Barnes be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[38]

New Orleans, Louisiana, this twelfth day of March, 2018.


JANIS VAN MEERVELD
**UNITED STATES MAGISTRATE JUDGE**

---

[38] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.